Good morning, Your Honors. John Grayley on behalf of Alan Adams, petitioner in this case. Your Honors, in this case, Mr. Adams, who was 17 years old and drunk at the time of the crime, never got a fair shot. He never got a fair shot at trial, and he certainly didn't get a fair shot in his first habeas round in state court. And there are a lot of issues that require us to unpack the A.D. proceedings, and I'm going to try to do that today. I'm going to start with the first one, which is the P.A. and deference and things of that nature, but there's one issue that doesn't require that. There's one issue that requires that allows us to get to the heart of the case, independently review it, and obviously our position is establishes error, prejudicial error by counsel, and that is the lying in wait issue. This case hinges on a very thin thread of lying in wait. And how do we know that the first-degree murder hinges on lying in wait? We know it from the verdict, the companion verdict in this case, which says that the State did not need its burden to prove malice, premeditation, or deliberation. We know it from the jury's question. The jury's question at the end of the case is, do we have to find lying in wait? Do we have to find malice? Do we have to find premeditation? Do we have to find deliberation? Altogether, are one of those sufficient? Well, the answer is, altogether, except one of those is sufficient with lying in wait. Sotomayor, what is the clearly established Federal law that was violated there? Well, the clearly established Federal law is that trial counsel has to investigate his case and present evidence to support it and impeach the State's case. He can't just sit there while the State steamrolls over him and presents this evidence of lying in wait that is eminently impeachable and that every witness says is wrong. By the way, the instruction on lying to wait stated, if I remember it correctly, premeditation or deliberation. So stated it disjunctively, whereas the instruction on attempted murder, I think, stated it conjunctively. Now, you know, there's some tension in that. But this is an issue of what is California law about lying in wait. So under the AEDPA, when we review this case, aren't we bound to accept the California court's determination of what their law is on lying in wait? We are. We are bound to accept their determination. We have elsewhere in the brief in our request to expand the certificate of appealability, we've really asked this Court to take a hard look at that lying in wait instruction in light of the very particular evidence in this case. And we have something, a companion verdict, that we never really have in most cases. And it really illustrates what's wrong, what's unconstitutional about that instruction. But for my purposes, we don't have to reach that. Yeah. If the State says that instruction is okay in their appellate system, then how can we review that instruction? Well, they can say the instruction is okay if they want. But the statute, they can't say the statute says A, but tomorrow we say B. And that's our complaint. How does that violate Federal law? Well, that's the due process violation. You have a due process right to the statutory definition of the crime. You can't just say, well, we've been down that road before trying to argue that a State construction of its own statute is so unreasonable that it violates Federal law, and we get slant down. I understand that. And that's not a certified issue in this case. And we don't even have to reach that issue of what we really don't have to reach that issue, because in this case, we have a lying in wait verdict, we know it's a lying in wait verdict, it's been told it's a lying in wait verdict, Respondent doesn't dispute it's a lying in wait verdict in their briefs. And we have the only evidence, the very thin thread that attaches lying in wait is Brian Schiff's testimony that he saw Mr. Adams circling in the dark, which, by the way, we have a State appellate court finding fact that's obviously incorrect, and I think Respondent even admits it's incorrect as to the approach. But that description is imminently impeachable, and it never gets impeached. And so is the are we talking I guess I'm not sure whether we're talking about the instruction or whether we're talking about the performance of counsel. Performance of counsel, Your Honor. I apologize. That's correct. So the guy who pulled up behind the truck, Mr. Chips, was that his name? That's correct. Okay. So he says that Mr. Adams was walking in a circle or in an arc with the bat behind his back. Crouching in the dark as well, Your Honor. There's other statements that the lawyer could have impeached that with, to say, no, he wasn't going in any circuitous way. He was heading more directly there. However, don't those statements, are they inconsistent with him having the bat behind his back? Well, let's assume he walked straight from the garage to the fight scene, he didn't go in an arc, he wasn't crouching, and it was light and it wasn't dark, but he had a bat. He didn't brandish the bat and say, get out of here, hit it behind his back, and then he hit someone in the head with it. Could that be lying in a way? That is concealment of purpose, and that is one element of the lying in wait instruction, but that's not substantial period of watching and waiting. And that's where it gets confused, and that's where the briefing gets confused. And also there's a dispute about that testimony, necessarily. If you look at Mr. Osborne's statement, he pulls the bat out somewhat earlier, but the concealment of the bat does not establish lying in wait, not by any means. But that's not what the jury heard, and that's not what the prosecutor summed up to. The prosecutor summed up to Brian Chips' testimony. That's his closing argument on lying in wait. Lying in wait, you don't have to find all these elements, you just have to find implied malice, and by the way, lying in wait, we've got witness testimony that was lying in wait. You ought to keep your focus on the deficient performance of the Federal public defender, State public defender. Well, the deficient performance was you had statements in counsel's hands that say, I saw Mr. Adams go from point A to point B, and those never get brought to the jury. Instead of what the jury hears is from Danny Osborne and the eyewitness McDonald, I believe her name is, is that they saw the approach at some point between A and B, leaving this gap in this approach that the prosecutor fills in with Chips' testimony. Well, I guess what your argument is that if the counsel's performance had been up to par, he would not have been convicted of first-degree murder, he would have been convicted of manslaughter. Or second-degree murder. Second-degree murder. That's correct. That's correct. Which is the exact thing that counsel did or didn't do that would likely have led the or should have done differently, that had he done so would have led the jury to find a different crime was what? Was failing to impeach the State's evidence on lying in wait. Failing to when that testimony from Chips came out, the four statements that Chips gave that were inconsistent with that testimony, and including one in which he says he did see the route and it which comes out at the preliminary hearing, but counsel doesn't know how to impeach witnesses with prior inconsistent statements. We see that in the intoxication. So wait a minute, so what, so he should have impeached him one, two, three. Let's go one, two, three. One, two, three. Should have impeached him with his statement to Officer Sylvia at the scene that not only did he not see the assault, he didn't see the approach. He should have impeached him with his statement to Detective Lawson where he says on the witness stand, he says, well, I had a traumatic memory problem and I didn't remember it for about a month later. He should have impeached him with that statement and says, look, you remember this specific detail, no trauma there. You remember that specific detail, no trauma there. You remember that specific detail, no trauma there. That specific detail, no trauma there. There's just an array of details in the statement. And then impeached him with the statement that he made somewhat later to Detective Lawson saying he did see the approach and it was direct. Okay. So the witness is there. There were some impeachment – there were some prior statements he could have been impeached with. This amounts to prejudicial ineffective assistance of counsel. And what is the closest case that the State courts should have followed and the district courts should have followed in saying that this was clearly a violation of Federal law? Well, I mean, when you analyze a cold record like we have in this case with the postcard denial from the State supreme court, the question is whether or not it's in a reasonable application of Strickland. And this Court engages in independent review of that. And so this Court can take into consideration all of these facts and should under Himes. And so the question is whether or not that's performance that falls below the standard of care. And it's trial attorney 101. This is what you do when a witness gets on the stand and says something completely different. Sure. But we don't grant petitions for habeas corpus just on the grounds that there could have been a better impeachment of a witness. I don't – if there is a case that says that, I'm not familiar with it. It's on – if it's an impeachment of a witness on a critical issue that goes to the heart of the State's case, that – and impeachment – by impeachment, I mean not just confronting Chips with his prior statements, but eliciting the statements from the other independent witnesses that are inconsistent with Chips' case. What is the law that the Supreme Court of California Federal law should have followed in granting this case? Well, it should have followed Strickland. It should have – it should have – Well, Strickland is a standard. That's right. But it's not an application of that standard to – to a similar – doesn't have to be identical, but it should be something having to do with impeachment. Right. For the contrary two-prong, we do have to have that kind of similarity with – with Supreme Court precedent. For the unreasonable application prong, we do not. We look at what were the reasons for counsel's actions and whether or not the result would have been different had counsel not undertaken those actions or admissions. And that's a standard analysis that we do in every context. It doesn't – we don't have to have a case directly on point that says if lying in wait, evidence isn't impeached, and it's the crux of the State's case. And we know it's the crux of the State's case, Chips' testimony, in this case, from Respondent's own briefing. They say that there's sufficient evidence of lying in wait because he approached in the dark. Approaching in the dark is Chips' testimony. How about – okay. You don't have to have evidence of a – you don't have to have a case where someone didn't impeach lying in wait testimony, but do you have any case of – and I'm not saying you have to have it, but is there any Supreme Court precedent applying Strickland to a failure to impeach a witness? I am not aware of any such case off the top of my head. Any Ninth Circuit precedent or any extra circuit precedent of another circuit holding that a failure to impeach a witness was in effect of assistance under Strickland? Well, off the top of my head, I don't have the case. But we do have a host of cases in which this happens with confidential informants where they're on the stand and trial counsel's got to – trial counsel never investigates the informant and never presents any of the evidence that would have impeached that informant's credibility. And I think that there are those cases. And I wanted to move on a little bit to the other areas of counsel's ineffectiveness because I think it does tie in very closely to this. Because counsel admits that he doesn't know how to get evidence in in this case. He admits that he didn't know how to get evidence of intoxication in in this case. He's got the witnesses. They have it in their hands, literally in their hands, the impeachment evidence, and he doesn't ask the questions about it. So the jury is left with the idea that perhaps Mr. Adams only drank six beers that night, which, by the way, when you confine with the blunder concerning Patel, where counsel tells Patel the night before the evidence at trial is 10 to 12 beers and everybody's looking around the courtroom saying 10 to 12 beers, where did that come from? And Patel based all his estimates on that. Well, when you combine those two, you understand where his intoxication defense fell apart. Now, intoxication doesn't necessarily have to negate premeditation deliberation or malice in this case because it's a lying in wait case. So intoxication really – that's what the prosecution summed up to, which was we have an implied malice verdict here. We have implied malice and we have lying in wait. Well, I thought the State court was concerned or had some part of its rationale that suggested that the way he acted wasn't like he was sufficiently drunk to negate the mental element. That is, he came up – for one thing, he swung a bat and delivered a blow to someone's head and he did that twice with the two different people. And also, he made up a story afterwards, like a false story about a third-party assailant. So I thought that the State appellate court gave some weight to issues like that, that may undercut the relevance of how many beers he drank. Well, the State appellate – neither the State appellate court nor the State habeas court addressed those issues. They did not rely on that evidence because those instances are entirely consistent with somebody who is intoxicated. Going and grabbing a weapon and bringing it back and hitting somebody in the head is not inconsistent with being intoxicated, and neither is giving a lie to the police. All the boys lied to the police that night. They all did. And they all intoxicated. Well, they did argue intoxication, as I understand. As I understand, the dispute was whether they purchased, what, two 12-packs or three 12-packs? That's correct. And the prosecution opens the case. A group of people. Opens his case by saying it's three. Then when that – when that testimony goes south, he's able to take advantage of that and say it's really only two. There's only six – there's only – there's only two 12-packs here, which means six beers for Mr. Adams. And the impeachment that could have been offered in that context was not only the impeachment of the witnesses that went south, but also the independent witnesses who were not eight or nine, if not ten beers. But he had bottle caps in his coat or something. The bottle caps in his coat is very interesting. And that's what apparently Flower is attempting to hinge his 10 to 12 beers facts to support Patel's testimony on. Unfortunately, he forgets the critical issue. And that is, what does that 10 or 12 bottle caps in Mr. Adams' pocket actually mean? You know, if he had bothered to talk to his client about it with Dr. Patel or anybody else, for that matter, there might have been testimony saying that it actually means something. And the prosecutor was – was right, that it doesn't – there's no testimony that it actually means anything. And – and, again, another example. But it doesn't matter whether they bought two 12-packs or three if you have evidence that he drank, you know, 11 beers or nine beers, whatever the number of bottle caps are. Well, the bottle caps is circumstantial evidence of that number of beers. If the jury knows that that's the routine. The question is whether – I thought was whether he had the mental state to form the intent to do what happened. And as to that, there was a lot of other evidence, wasn't there? There was – there was very little evidence, actually, when you look at the record. And my time – I wanted to reserve some time for rebuttal. But I think there's very little evidence of that because all the evidence is consistent with him having been intoxicated. And – and the only thing he does is he goes and gets a bat from where he's been drinking the beers. And he brings it back directly to the victims and swings it at his head. And – and his testimony is, I didn't think I swung that hard. The district court points to the sheriff's testimony that didn't – didn't – didn't find him drunk enough to justify public intoxication. And – and he fabricated a story of somebody else doing it. Well, fabricating a story of somebody else doing it is not evidence you're not intoxicated. And the standard that the – that the officer is using at the scene is a very, very low standard. It's the lowest standard you could – I mean, he has to be falling over drunk. And that was explained by Patel's testimony, that that's not necessarily the mental state involved. I'd like to reserve the balance of my time. Thank you. May it please the Court, Peggy Ruthray for Respondent. Your Honors, on the lying in wait issue, I have a few comments. First of all, I don't think it's clear that that was, in fact, the theory of first degree murder that the jury used to convict. The prosecutor also argued that it could be premeditation and deliberation. And as far as I can tell, there's nothing in the record that indicates that that was, in fact, the theory that they used. But they – they rejected the attempted murder of the guy who lived. Correct. And that swing of the bat was very close in time to the first one. So how could they have had this – you know, how could they have found premeditation and deliberation with regard to Mr. Sheave, but not with regard to Mr. McKay? Well, I agree that that is less likely. But jurors can do whatever they want. And it's possible that they could have just decided there were two different intents. But assuming that they did rely on a lying in wait theory, it's our position that even if there was only testimony that Mr. Adams walked directly toward the victims, that is sufficient for lying in wait. And the California Court of Appeal found that the jury instruction given in this case was a correct statement of the law. And that says that lying in wait is awaiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise, even though the victim is aware of the murderer's presence. The lying in wait need not continue for any particular period of time, provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation. And the California Supreme Court – now, this is actually in our district court briefing because the lying in wait issue per se is not certified for appeal. But the California Supreme Court has said that they've never required a certain minimum period of time for the watching and waiting. And they reject that there has to be some kind of pause, a literal waiting before acting as a too literal interpretation of that statute. So in this case, even assuming, as I said, that he just walked directly to the victims instead of sweeping around, he approached in the dark. He saw that the victims were there with their backs to him and couldn't see him approach. He saw that that was an opportune time to approach them. He walked toward them with the back concealed, either behind his back or under his jacket. There was several – there was testimony as to both. And then he totally surprised them from behind in a classic ambush. So it's our position that even if that was the sole testimony, that would be sufficient for a lying in wait finding. But on the performance prong, the attorney was not actually as defective as counsel would have it. He did impeach Mr. Chips. This is in the excerpts of record at 158. And he asks Mr. Chips, I want to go back to your interview with Detective Lawson. Do you recall telling him that you couldn't even see Alan walk up, that you just heard a crack and the guy hit the ground? And he says that there are things that he's actually remembering it better now than he did at the time. And he also impeaches him with his statement to Detective Lawson that he didn't see him approach at all. And he makes the point that his memory would have been better closer in time to the incident than much later. And then the attorney uses that inconsistency in his closing argument to make the point that Mr. Chips' testimony on this idea can't be believed. And that's in the supplemental excerpts of record at 95 and 96, his closing argument on this point. And as to what the other witnesses testified, in fact, there are no inconsistencies between what they testified at trial and the statements that they had made previously. And I think if you just look closely at the previous statements and the trial statements, you will see that there was actually no inconsistency. So when you put that all together, possibly the attorney could have shown that Mr. Chips' prior testimony and had him read it as opposed to saying, isn't it true that you previously told Detective Sylvia that you didn't see the approach at all, and having him agree to that. But he did effectively impeach him on that point. So there was no ineffective assistance, either the performance prong or the prejudice prong. Was there argument to the jury? Yes, it's at the supplemental excerpts of record at 95 to 96. And he specifically relies on those inconsistencies by Mr. Chips to argue that his testimony that he swept around couldn't be believed. Now, on the claims about the intoxication and how much beer was purchased and the effectiveness of the intoxication expert, all of that boils down to was he sufficiently intoxicated to negate the mental states that are required for first-degree murder. And the one thing that nobody could get around was his contemporaneous actions at the time of the crime. Immediately after swinging the bat and hitting the two victims, somebody went and called 911 during that time, and they came very shortly after. During that time, he came up with this story that it was some third person, he said where they came from behind the parked cars, he described to the officers what this person was supposedly wearing, a starter racing jacket. He said it was a white male, and then he said he ran off toward the safeway. So he very quickly and contemporaneously concocted this detailed story about a third person. And no mental health expert could refute that evidence that he, in fact, had the sufficient mental state, even though he was drunk. He wasn't so intoxicated that he couldn't form specific intent or have the other mental states because of this contemporaneous evidence. The trial court found that those false statements admissible saying the following. The defendant's conduct is certainly relevant, for it shows he had the mental acuity to, one, have known that he harmed someone, second, that he was in apparent trouble for causing that harm, and third, that he needed to direct attention away from himself in an effort to avoid that trouble. Those mental steps are evidence of the defendant's capacity at or near the time of the assault, since his claim now appears to be that he did not have the mental ability to form specific intent. The trier of facts should certainly be allowed to hear evidence which shows that a short time after the offense, he had the capacity to invent a story. So that is extremely significant. Is that, you know, it seemed to me when I was reading this, that it was a little like the classic joke of nobody was driving, officer, we were all in the back seat. It was a rather strange story. It might not have been a very good story. I agree with you on that. But that's not the issue. The issue is whether he could come up with this story immediately and in such detail. So there was expert testimony that that? No, I'm saying that that is the kind of testimony, the kind of evidence that no mental health expert could refute, even if they weren't impeached with anything. Was there a mental health expert? Well, yes, there was Dr. Patel. Okay. He was the one who was impeached, although other than that, his testimony was. He was the one who had an unfortunate past. Correct. Correct. But what I'm saying is even if you had a mental health expert who had no impeachment, who was white as the driven snow and could give that testimony very clearly, he couldn't get around that fact that contemporaneously, the defendant was able to come up with this story. And it's similar to, I cited this case in the brief, it's Hoffman versus Arraive, where the attorney presented no evidence whatsoever of drug use or mental disability, even though later on there was evidence that the defendant had psychosis and brain damage. But because at the time of the crime, he immediately realized that he should cover up the evidence of the murder by burning clothing, cleaning out the car and destroying a knife, that evidence wouldn't have persuaded the jury. What about the sheriff's testimony? Correct. The sheriff had arrested many, many people for public intoxication before, and he was the person that was right there at the scene shortly after. I mean, I think it was within 12 minutes. He agreed that Adams was intoxicated, but he didn't think he was so intoxicated to justify an arrest for 647F. And then just two hours after the crime, Adams' friend, I think her name was Shawna Pugh, testified that he was not, he didn't appear drunk at all. He came by her house at 4 a.m., and he did not appear drunk to her. And what that means is if he was really at a .27 or whatever the final testimony was as a possibility, he wouldn't have been sober by that time. And at a .27, he wouldn't have been able to concoct the story. On the question of whether there were three 12-packs-of-beer versus two, I think everyone was surprised at trial by the two boys who said that it was two instead of three, but they said they were certain it was two. And in fact, Brent Seaman, he's the 14-year-old who wasn't drunk that night. He just drank one beer and then went to bed. He said at trial that he was sure that they bought two. And Mr. Flower, the defense attorney, did impeach him with evidence that he had previously told the defense investigator that they had bought three. And he said, yes, I know I told your investigator that, but I'm sure it was two. So regardless of whether there was any further impeachment, there was a conflict in the testimony. That's just the way it ended up at trial. But the final – well, there was also evidence that he did drink these higher numbers. David Razor testified that everyone drank eight beers each. Blaine testified that they drank 9 to 12 beers each. And there were the 10 bottle caps in the pocket. So the jury had evidence that he drank a lot more if they wanted to believe that. But the real question wasn't simply how many beers he drank. It was whether he was so intoxicated that he couldn't form a mental state. So the fact that there was this surprise testimony from some of the people that it was two instead of three ultimately didn't make that much difference to the final question of how that beer affected him. And as I said, I think it's clear that he was intoxicated to some extent, but because of his actions at the time and his mental acuity at the time, that showed that he wasn't so drunk that he couldn't form the specific intent. He was 17 at the time. He was 17. He actually he wrote a letter to the judge subsequently where he said he had been drinking since he was 12 and that he drank as often as he could and he drank to get drunk as often as he could. So he clearly was the kind of person who could have built up a tolerance. And even by the time he was 17, 10 beers might not have affected him as much as somebody who was a novice drinker. Kagan. When did the crime take place in 1990? The crime was in 1995. The trial was in 1996. I don't think I have anything. I'm sorry. But was there no evidence? As I understand it, he also drank some mixed drink that Ms. Burrow gave him before the beer was bought. Correct. Is there any evidence on the composition of that drink? I think there was. It was a vodka cranberry drink, and that did come out at trial, although it didn't come out from Ms. Burrow herself. I think that Dr. Patel mentioned that there was evidence that he had had this vodka cranberry drink. I don't think the doctor counted that in his calculations because he didn't have corroboration for it, but he still came up with these very high levels of blood alcohol content based on what he did have. So the jury had that evidence in front of them. They understood that intoxication was one of the defenses, but again, they couldn't get around the fact of his contemporaneous actions that showed he wasn't so intoxicated that he couldn't form specific intent. Thank you. Is that time remaining? Thank you. You know, Your Honor, when I look at this case and hear the arguments of counsel relying yet again on Chips' testimony of the approach in the dark for lying in wait and yet again more evidence that it was prejudicial not to get it in, the prosecution never said that it was lying in wait because he concealed the bat behind his back. The prosecution said it was lying in wait because of Chips' testimony. Chips' testimony is the only thing that establishes any period of watching and waiting for any opportunity time to act. The idea that he came up with this statement very quickly after the incident is not clear from the record at all. In fact, Chips testifies that the group gets together after the incident and is talking about their story, and the officer doesn't come until sometime later. The pretrial hearing that was identified by counsel where the court says it could be evidence, yes, it could be evidence that he came up with a story, but as the facts played out, it's not very significant evidence. Patel was never impeached by the prosecution with these facts. He was never asked by the prosecution, don't these facts militate against the intoxication defense? The District Court of Appeals felt that the intoxication defense was a viable defense. They said it. In fact, the jury believed it. Hoffman is a great example of the kinds of acts that you look at when you're looking at whether or not intoxication defense can apply. Look at all the things that were done in Hoffman compared to this case. Obviously, Hoffman had a mental state and no mental state issue. No arrest for public intoxication, it would have been illegal to arrest him for public intoxication at that point because you have to have an act. You can't just arrest somebody for being intoxicated in public. It's against the law. The Peugh testimony six or seven hours later shows why Patel's estimates are wrong, shows why Flower was committed misconduct with Patel. And I see that my time is out. And unless the Court has any further questions, thank you. Thank you. The case just argued was well argued and is submitted for decision. And the Court stands adjourned.
judges: Gould, Rawlinson, Covello